DAVIS WRIGHT TREMAINE LLP

Joseph E. Addiego III (CA State Bar No. 169522)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
Telephone: (415) 276-6500
Facsimile: (415) 276-6599
Email: joeaddiego@dwt.com

STEPHEN M. RUMMAGE (*Pro hac vice application to follow*)
CANDICE M. TEWELL (*Pro hac vice application to follow*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, Washington 98101-3045
Telephone: (206) 622-3150
Fax: (206) 757-7700
Email: steverummage@dwt.com
candicetewell@dwt.com

Attorneys for Defendant
SPOTIFY USA INC.

FILED
2013 DEC -6 P 12:56

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

DMR

| | |
|---|---|
| MELISSA BLEAK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SPOTIFY USA INC., a Delaware corporation,<br><br>Defendant. | Case No. CV 13 5653<br><br>**DECLARATION OF GÖRAN SANDER IN SUPPORT OF SPOTIFY USA INC.'S NOTICE OF REMOVAL**<br><br>**(Removed from San Francisco County, Superior Court, Civil Case No. CGC 13 535309)**<br><br>**State Action Filed: November 6, 2013** |

I, GÖRAN SANDER, declare as follows:

1. **Qualifications of Declarant.** I am an employee of Spotify AB, the parent company of Spotify USA Inc. ("Spotify"), where I have worked since January 2008 I have had several roles at Spotify. Currently, I am an analyst in Spotify's Analytics team in Stockholm, a

DAVIS WRIGHT TREMAINE LLP

team I joined in approximately 2010. My employment responsibilities include analyzing a wide variety of data from databases maintained by Spotify in the ordinary course of its business. I am familiar with Spotify's database systems and how to query those systems. I am also familiar with techniques of data analysis. My job regularly entails analyzing Spotify's financial data for various business purposes. I also have been called upon from time to time to extract and analyze Spotify data for litigation purposes like the present matter.

2. **Personal Knowledge.** I have personal knowledge of the facts set forth in this Declaration, except as to those facts on which I state that I am relying on business records, and I am competent to testify to those facts.

3. **The Spotify Service.** Spotify is an online service that allows users to search, stream, and download music. Certain free services are available to Spotify users, but to download music or access the full Spotify functionality on devices other than a computer, including phones and tablets, users must generally pay a monthly fee.

4. **Plaintiff's Complaint.** I understand that at issue in this lawsuit are automatically recurring payments of Spotify subscribers in California who have upgraded to the "Premium" and "Unlimited" services within Spotify since July 2011.[1] Spotify charges $9.99 per month for the Premium service and $4.99 per month for the Unlimited service. To the best of my knowledge, these prices have remained constant since Spotify launched in the United States in July 2011.

5. **Location of Spotify Subscribers.** Spotify keeps records of its U.S. subscribers' location, including based on the geocodes (longitude and latitude) associated with a subscriber's IP address. Spotify has a practice of creating, maintaining, and relying on these records identifying its subscribers' locations.

6. **Spotify Database Queries and Calculation Methods.** I reviewed records identifying the number of paying Spotify customers in California for January through November 2013. These records are the result of queries to a Spotify data source called "end_song_cleaned," which contains data regarding songs streamed by Spotify subscribers, including the IP address

[1] Plaintiff in this case seeks damages relating to Spotify subscribers in California going back to December 2010. However, the Spotify service did not launch in the United States until July 2011.

from which the song was streamed. Spotify uses a service called MaxMind (www.maxmind.com) to map those IP addresses to geodata indicating where a user is located.

a. I queried records relating to all Spotify Premium subscribers who streamed music in California for more than 30 seconds during the first seven days of each relevant month.

b. The database identified the location of these customers by geo-locating their IP addresses used to stream Spotify.

7. **Spotify Premium Numbers for California Desktop Subscribers.** I have reviewed the records described in Paragraph 6 above accounting for Spotify Premium subscribers in California from January through November 2013.

a. According to these records, well over 100,000 California subscribers have paid for Spotify Premium in *each* month of 2013, from January through November. Indeed, for these 11 months combined, Californians purchased more than 2.2 million months of Spotify Premium. These numbers exclude free months included as part of a trial; they include only paid months.

b. When using geolocation data, it is possible that some users will be counted in more than one state, e.g. if a user travelled from one state to another during the course of a single day, during the first seven days of the month. There are some explanations for why a user can appear to move from one state to another, even when the user has not moved. Based on Spotify Premium usage data and the IP address-to-state translation we use, I understand that as an outside bound, up to approximately 30% of U.S. subscribers stream Spotify Premium from IP addresses in different states on a monthly basis. After subtracting the up to 30% of subscribers who may have streamed Spotify Premium in both California and in another state, Californians still purchased more than 1.5 million paid months of Spotify Premium in 2013.

c. Each subscriber pays $9.99 per month for Spotify Premium.

d. This means Californians paid more than $15 million for Spotify Premium in 2013.

e. Most Spotify users pay for the Premium service with automatically recurring payments. But payments made using pre-paid gift cards are not automatically recurring.

Spotify has sold $142,000 worth of pre-paid gift cards in California in 2013. From January through November 2013, it is my understanding all payment methods in the U.S. other than pre-paid gift cards involved automatically recurring payments. Thus, even subtracting the $142,000 of pre-paid gift cards, Californians still paid more than $15 million in automatically recurring payments for Spotify Premium during this time period.

f. Spotify does not track whether its California subscribers purchased Spotify Premium service on a desktop or mobile platform. However, Spotify uses Google Analytics, a tool that generates detailed statistics about a website's traffic and traffic sources, in order to measure conversions and sales. Specifically, Spotify is able to use Google Analytics to determine what percent of users who reach the "payment success page" (the page that indicates Spotify received a payment) did so on various operating systems. By looking at what operating system a customer was using, Spotify can determine whether the customer was using a desktop computer or a mobile device. Based on this information, which I reviewed, our team determined that 65% of Spotify customers in the US who reached the "payment success page" in 2013 did so on desktop computers, while 35% did so on mobile devices. Therefore, these records, upon which Spotify regularly relies, indicate 65% of Spotify's US subscribers in 2013 upgraded to Spotify Premium on desktop computers (i.e. not on mobile devices).

g. Thus, for the months of January through November 2013 alone, California subscribers who upgraded to Spotify Premium on a desktop computer spent more than $9.75 million via automatically renewing payment methods for Spotify Premium.

8. The calculation in Paragraph 7(g) above significantly ***underestimates*** the total amount of money spent by California subscribers via automatically renewing payment methods since July 2011, for several reasons.

a. The database query undercounted the total number of Spotify users who paid for Premium services in a given month, because it only counted paying subscribers who streamed music during the first seven days of a given month, and thus ignored all of the subscribers who did not stream any music during those days, but did so during the remaining days in question (or did not even stream any music during the month at all).



DAVIS WRIGHT TREMAINE LLP

b. The calculation above only takes into account revenue from January through November 2013. It excludes payments made by California subscribers from July 2011 through December 2012, during which time Spotify Premium was available in California.

c. The calculation above ignores revenue from Spotify's "Unlimited" service, for which California subscribers must pay $4.99 per month.

d. The calculation above ignores revenue from the more than 300,000 user-months of Spotify Premium whose users' locations could not be determined (possibly because they only accessed Spotify from mobile devices). Presumably, a large number of these 300,000 user-months (representing $3 million in payments) derived from California customers who originally purchased Spotify Premium on a desktop computer.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed this 6th day of December, 2013, in Stockholm, Sweden.

Göran Sander

DAVIS WRIGHT TREMAINE LLP