JOSEPH E. ADDIEGO III (CA State Bar No. 169522)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
Telephone:     (415) 276-6500
Facsimile:     (415) 276-6599
Email:         joeaddiego@dwt.com

STEPHEN M. RUMMAGE (*Admitted pro hac vice*)
CANDICE M. TEWELL (*Admitted pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, Washington 98101-3045
Telephone:     (206) 622-3150
Fax:           (206) 757-7700
Email:         steverummage@dwt.com
               candicetewell@dwt.com

Attorneys for Defendant
SPOTIFY USA INC.

# IN THE UNITED STATES DISTRICT COURT

## THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MELISSA BLEAK, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>SPOTIFY USA INC., a Delaware corporation,<br><br>        Defendant. | Case No. CV 13-05653 CRB<br><br>**DEFENDANT SPOTIFY USA INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY ACTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: March 21, 2014<br>Time: 10:00 a.m.<br>Courtroom: 6 – 17th Floor |

DAVIS WRIGHT TREMAINE LLP

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 21, 2014, at 10:00 a.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Charles R. Breyer of the above-entitled United States District Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Spotify USA Inc. ("Spotify") will and hereby does move this Court, pursuant to 9 U.S.C. §§ 2, 3, and 4, for an Order compelling Plaintiff Melissa Bleak to arbitrate her individual claims against Spotify and staying this action until the conclusion of arbitration.

In the Amended Complaint, Ms. Bleak asserts, on behalf of herself and a putative class of California consumers, claims for violation of the Business & Professions ("B&P") Code §§ 17602, 17603, and 17535, and California's Unfair Competition Law, B&P Code §§ 17200, *et seq*. (the "UCL"). She alleges Spotify violated these statutes by automatically renewing Ms. Bleak's Spotify subscription without first obtaining her affirmative consent. Ms. Bleak demands statutory penalties on behalf of herself and each putative class member. Spotify now moves for an Order compelling Ms. Bleak to arbitrate her claim on an individual basis. Ms. Bleak agreed to Spotify's enforceable arbitration and class action waiver provisions when she registered for Spotify's free service on August 26, 2013, and upgraded to Spotify's Premium service minutes later.

Spotify bases this Motion on this Notice of Motion and Motion, the attached Summary of Argument and Memorandum of Points and Authorities, the concurrently filed Declarations of Patrick Lambert and James Whitehead, with associated exhibits, all pleadings and papers on file with this Court in this action, and any further oral and written argument and evidence the parties may present at or before the hearing.

Respectfully submitted this 27th day of January, 2014.

DAVIS WRIGHT TREMAINE LLP
Attorneys for Defendant Spotify USA Inc.

By: */s/ Joseph E. Addiego III*
    Stephen M. Rummage
    Joseph E. Addiego III
    Candice M. Tewell

# **TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................. 1

II.     ISSUES TO BE DECIDED.................................................................................. 2

III.    FACTUAL BACKGROUND ............................................................................... 2

        A.      Ms. Bleak's Allegations. ........................................................................ 2

        B.      Ms. Bleak's Agreement to Arbitrate and Spotify's Disclosures. ............... 3

IV.     ARGUMENT ...................................................................................................... 7

        A.      The Federal Arbitration Act Reflects a Strong Policy Favoring
                Arbitrating Disputes that Fall within an Arbitration Clause, as This
                Dispute Does. ....................................................................................... 7

                1.      Ms. Bleak Agreed to the Arbitration Provision............................. 7

                2.      Ms. Bleak's Claims Fall within the Arbitration Provision........... 9

        B.      Ms. Bleak Cannot Invoke California Law to Avoid Her Obligation to
                Arbitrate Under the FAA....................................................................... 10

                1.      Under *Concepcion*, the FAA Requires the Court to Enforce Ms.
                        Bleak's Agreement to Arbitrate on an Individual Basis............... 11

                2.      Spotify's Arbitration Provision Offers a Fair and Efficient
                        Means of Resolving Disputes and Is Not Overly Harsh or One
                        Sided.......................................................................................... 13

V.      CONCLUSION ................................................................................................. 15

SPOTIFY USA INC.'S MOTION TO COMPEL ARBITRATION AND STAY
*Bleak v. Spotify USA Inc.*, Case No. CV 13-05653 CRB
DWT 23347003v13 0098755-000003

DAVIS WRIGHT TREMAINE LLP

# TABLE OF AUTHORITIES

**Cases**

*Alvarez v. T-Mobile USA, Inc.*,
    2011 WL 6702424 (E.D. Cal. Dec. 21, 2011) .......................................................... 3

*Armendariz v. Found. Health Psychcare Servs., Inc.*,
    24 Cal. 4th 83 (2000) ............................................................................... 13, 14, 15

*AT&T Mobility LLC v. Concepcion*,
    131 S. Ct. 1740 (2011) ...................................................................................*passim*

*Blau v. AT&T Mobility*,
    2012 WL 10546 (N.D. Cal. Jan. 3, 2012) ........................................................ 9, 13

*Britton v. Co-op Banking Grp.*,
    4 F.3d 742 (9th Cir. 1993) ..................................................................................... 9

*by Lombardi v. DirectTV, Inc.*,
    2013 WL 6224642 (9th Cir. Dec. 2, 2013) ......................................................... 15

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
    2005 WL 756610 (N.D. Cal. Apr. 1, 2005) .......................................................... 9

*Chavez v. Bank of Am.*,
    2011 WL 4712204 (N.D. Cal. Oct. 7, 2011) ......................................................... 8

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
    207 F.3d 1126 (9th Cir. 2000) .......................................................................... 7, 9

*Circuit City Stores, Inc. v. Adams*,
    279 F.3d 889 (9th Cir. 2002) ............................................................................... 11

*Cisneros v. Am. Gen. Fin. Servs., Inc.*,
    2012 WL 3025913 (N.D. Cal. July 24, 2012) ..................................................... 13

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) .............................................................................................. 7

*Discover Bank v. Ray*,
    162 P.3d 1131 (Wash. Ct. App. 2007) ............................................................. 9, 12

*Discover Bank v. Superior Court*,
    36 Cal. 4th 148, 113 P.3d 1100 (2005) ............................................................... 11

*Fimby-Christensen v. 24 Hour Fitness USA, Inc.*,
    2013 WL 6158040 (N.D. Cal. Nov. 22, 2013) ................................................... 13

DAVIS WRIGHT TREMAINE LLP

SPOTIFY USA INC.'S MOTION TO COMPEL ARBITRATION AND STAY
*Bleak v. Spotify USA Inc.*, Case No. CV 13-05653 CRB
DWT 23347003v13 0098755-000003

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995) ............................................................................................ 1, 7

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991) .................................................................................................. 7

*Golden Eagle Ins. Co. v. Foremost Ins. Co.*,
    20 Cal. App. 4th 1372 (1993) .................................................................................. 8

*Harper v. Ultimo*,
    113 Cal. App 4th 1402 (2003) ................................................................................ 14

*Hauenstein v. Softwrap Ltd.*,
    2007 WL 2404624 (W.D. Wash. Aug. 17, 2007) ..................................................... 8

*Hendricks v. AT&T Mobility, LLC*,
    823 F. Supp. 2d 1015 (N.D. Cal. 2011) .................................................................. 14

*In re DirectTV Early Cancellation Fee Litig.*,
    810 F. Supp. 2d 1060 (C.D. Cal. 2011) .................................................................. 15

*Jasso v. Money Mart Exp., Inc.*,
    879 F. Supp. 2d 1038 (N.D. Cal. 2012) .................................................................. 13

*Johannsen v. Morgan Stanley Credit Corp.*,
    2012 WL 90408 (E.D. Cal. Jan. 11, 2012) .............................................................. 10

*John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*,
    119 F.3d 1070 (3d Cir. 1997) ................................................................................. 10

*Kinkel v. Cingular Wireless LLC*,
    857 N.E.2d 250 (Ill. 2006) ..................................................................................... 14

*Lewis v. UBS Fin. Servs. Inc.*,
    818 F. Supp. 2d 1161 (N.D. Cal. 2011) .................................................................. 13

*Luafau v. Affiliated Computer Servs., Inc.*,
    2006 WL 1320472 (N.D. Cal. May 15, 2006) ........................................................... 8

*Mission Viejo Emergency Med. Assocs. v. Beta Healthcare Grp.*,
    197 Cal. App. 4th 1146 (2011) ................................................................................. 8

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) .................................................................................................... 9

*NORCAL Mut. Ins. Co. v. Newton*,
    84 Cal. App. 4th 64 (2000) ...................................................................................... 9

*Oestreicher v. Alienware Corp.*,
    502 F. Supp. 2d 1061 (N.D. Cal. 2007) .................................................................... 7

DAVIS WRIGHT TREMAINE LLP

*Oldroyd v. Elmira Sav. Bank, FSB,*
    134 F.3d 72 (2d Cir. 1998) ........................................................................ 10

*Pokorny v. Quixtar, Inc.,*
    601 F.3d 987 (9th Cir. 2010) ............................................................... 14, 15

*Register.com, Inc. v. Verio, Inc.,*
    356 F.3d 393 (2d Cir. 2004) ........................................................................ 9

*Roth v. Malson,*
    67 Cal. App. 4th 552 (1998) ........................................................................ 8

*Sanders v. Swift Transp. Co. of Az., LLC,*
    843 F. Supp. 2d 1033 (N.D. Cal. 2012) ..................................................... 13

*Schering Corp. v. First Databank, Inc.,*
    479 F. Supp. 2d 468 (D.N.J. 2007) ........................................................... 10

*Simpson v. Pulte Home Corp.,*
    2012 WL 1604840 (N.D. Cal. May 7, 2012) ............................................ 13

*Simula, Inc. v. Autoliv, Inc.,*
    175 F.3d 716 (9th Cir. 1999) .......................................................... 7, 9, 10

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*
    559 U.S. 662 (2010) ................................................................................... 12

*Swift v. Zynga Game Network, Inc.,*
    805 F. Supp. 2d 904 (N.D. Cal. 2011) ........................................................ 8

*West v. Henderson,*
    227 Cal. App. 3d 1578 (1991), *overruled on other grounds, Riverisland Cold Storage,*
    *Inc. v. Fresno-Madera Prod. Credit. Assoc.*, 55 Cal. 4th 1169 (2013) .................. 14

**Statutes**

9 U.S.C. § 2 ............................................................................................ 7, 10, 11

9 U.S.C. § 3 ...................................................................................................... 7

9 U.S.C. § 4 ...................................................................................................... 7

Cal. Bus. & Prof. Code § 17200 ................................................................... 1, 2

Cal. Bus. & Prof. Code § 17602 ................................................................... 1, 2

Cal. Bus. & Prof. Code § 17603 ................................................................... 1, 2

Cal. Bus. & Prof. Code § 17535 ................................................................... 1, 2

DAVIS WRIGHT TREMAINE LLP

v

## SUMMARY OF ARGUMENT

Ms. Bleak registered for Spotify USA Inc.'s ("Spotify") streaming music service on August 26, 2013. She upgraded to Spotify's paid Premium service a few minutes later and has enjoyed Spotify's streaming music service on her personal computer and mobile phone since that time. During registration, Ms. Bleak agreed to be bound by Spotify's Terms and Conditions of Use. Those Terms and Conditions of Use contain an arbitration provision and class action waiver, requiring Ms. Bleak to arbitrate her claims against Spotify on an individual basis. Instead, Ms. Bleak filed this action, seeking statutory damages for Spotify's alleged violations of B&P Code §§ 17602, 17603, and 17535, and the UCL.

Spotify respectfully requests the Court (a) order Plaintiff Melissa Bleak to arbitrate her claims on an individual basis, as she agreed under her Spotify contract; and (b) stay this case pending arbitration.

***Ms. Bleak Entered into a Binding Contract with Spotify.*** The Federal Arbitration Act ("FAA") instructs that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA requires courts to compel arbitration if (1) a valid agreement to arbitrate exists and (2) the dispute falls within the scope of that agreement. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Spotify informed Ms. Bleak that by registering for Spotify's service she agreed to Spotify's Terms and Conditions of Use, which were accessible through a hyperlink. Ms. Bleak proceeded with the registration and has enjoyed Spotify's streaming music services for the last five months. Ms. Bleak thus entered into a contract with Spotify, *see Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011), and accepted the benefits of that contract. *See Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal. App. 4th 1372, 1387 (1993). Ms. Bleak's claims arise from her purchase of Spotify's music service and fall within the broad "any dispute, claim or controversy" language of Spotify's arbitration clause.

***Spotify's Terms and Conditions of Use Create an Enforceable Agreement to Arbitrate.*** Under the FAA, a court may declare an arbitration provision unenforceable based only on

1    "'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not

2    defenses that apply only to arbitration or that derive their meaning from the fact that an agreement

3    to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1746 (2011) (citation

4    omitted).  Both federal and California law require enforcement of Spotify's arbitration agreement.

5    First, under *Concepcion*, the FAA preempts previous California law conditioning enforcement of

6    arbitration agreements on the availability of class actions.  *Id.* at 1748.  Second, Ms. Bleak cannot

7    show Spotify's Terms and Conditions of Use are both procedurally and substantively

8    unconscionable.  *See Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114

9    (2000).  Because Spotify's arbitration clause imposes a fair, convenient, and evenhanded bilateral

10   obligation to arbitrate, it cannot be unconscionable.  *See In re DirectTV Early Cancellation Fee*

11   *Litig.*, 810 F. Supp. 2d 1060, 1069 (C.D. Cal. 2011), *overturned on other grounds by Lombardi v.*

12   *DirectTV, Inc.*, 2013 WL 6224642 (9th Cir. Dec. 2, 2013).

13       For these reasons, Spotify respectfully requests that the court (a) compel Ms. Bleak to

14   arbitrate her claims on an individual basis and (b) stay this case pending arbitration.

DAVIS WRIGHT TREMAINE LLP

## MEMORANDUM OF POINTS & AUTHORITIES

## I.    INTRODUCTION

Defendant Spotify USA Inc. ("Spotify") respectfully requests the Court (a) order Plaintiff Melissa Bleak to arbitrate, on an individual basis, her claims for alleged violations of Business & Professions ("B&P") Code §§ 17602, 17603, and 17535, and the Unfair Competition Law, B&P Code § 17200 et seq. (the "UCL"), as she agreed under her Spotify contract; and (b) stay this case pending arbitration.

Ms. Bleak registered for the Spotify service and accepted Spotify's U.S. Terms and Conditions of Use ("Terms & Conditions") on August 26, 2013.  In the Terms & Conditions, Ms. Bleak agreed to arbitrate the claims she asserts here and waived her right to participate in a class action.  As the United States Supreme Court held in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), the Federal Arbitration Act ("FAA") requires courts to enforce arbitration agreements, such as Ms. Bleak's, according to their terms, and preempts contrary state laws reflecting a bias against individual arbitration.  This Court should order Ms. Bleak to arbitrate on an individual basis, for the following reasons:

*First*, the FAA reflects a strong national policy favoring arbitration, which requires arbitration when (1) a valid agreement to arbitrate exists and (2) the dispute falls within the agreement.  Here, Ms. Bleak agreed to the arbitration clause by accepting Spotify's Terms & Conditions when she subscribed to the Spotify service.  Further, the broad arbitration clause to which Ms. Bleak agreed reaches her claims relating to payments for the Spotify service, because it covers "any dispute, claim or controversy arising out of or relating in any way to the Spotify Service or [Ms. Bleak's] use thereof."

*Second*, under *Concepcion*, the FAA preempts California case law purporting to condition enforcement of consumer arbitration agreements on the availability of class actions; thus, the fact Ms. Bleak agreed to arbitrate on an individual basis provides no ground for avoiding her promise to arbitrate.  In addition, the arbitration clause and its exceptions are mutual, requiring both Spotify and its subscribers to bring most claims in arbitration, while requiring other types of claims to proceed in court.  Finally, the arbitration clause offers an efficient means to resolve

1

SPOTIFY USA INC.'S MOTION TO COMPEL ARBITRATION AND STAY
*Bleak v. Spotify USA Inc.*, Case No. CV 13-05653 CRB
DWT 23347003v13 0098755-000003

disputes between Ms. Bleak and Spotify. It allows Ms. Bleak to achieve through arbitration the relief she could obtain in court—but more quickly and at lower cost.

## II. ISSUES TO BE DECIDED

Should the Court (a) compel Ms. Bleak to arbitrate her claims individually, as she agreed to do under her contract with Spotify, and (b) stay this case pending arbitration?

## III. FACTUAL BACKGROUND

### A. Ms. Bleak's Allegations.

Melissa Bleak, a California resident, first registered for Spotify's streaming music service in August 2013, using her desktop computer. Amended Complaint ("AC") ¶ 5. She upgraded to Spotify Premium the same day. *Id.* Ms. Bleak alleges Spotify offers "the ability to listen to streaming music for free . . . [and] has also offered [users] the ability to upgrade their membership to an Unlimited or Premium Plan." AC ¶ 12. Ms. Bleak states the "Premium Plan provide[s] consumers the ability to listen to music advertisement free from multiple devices including the consumer's desktop, laptop, and cellular phone." *Id.*

Ms. Bleak alleges she and the other proposed class members "were offered a one-month free trial to use the [Spotify] Premium Plan." *Id.* ¶ 16. She concedes Spotify provided the following notice to subscribers who selected the "Upgrade to 30 Day Trial" webpage: "If you do not cancel your subscription before the end of the free trial the credit card you provide will automatically be charged the Spotify Premium subscription fee of US $9.99 + $0.00 sales tax per month, until you cancel. You can cancel at any time by logging into your Spotify account and follow[ing] the cancellation instructions. . . . For complete terms and conditions, please see our Terms of Service." *Id.* ¶¶ 16-17.

Ms. Bleak contends Spotify's paid subscription services violate B&P Code §§ 17602, 17603, and 17535, and the UCL, because for both Unlimited and Premium plans, "prior to charging the Class Members [sic] credit card, debit card, or account, Defendant failed to first obtain the Class Members [sic] affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms because Defendant failed to first obtain the Plaintiffs and Class Members [sic] affirmative consent to the Defendant's Terms." *Id.* ¶¶ 15, 18.

DAVIS WRIGHT TREMAINE LLP

Ms. Bleak seeks to proceed on behalf of a putative class of California consumers who "upgraded their membership/subscription plan [with Spotify] from a free plan to a paid Unlimited Plan and/or Premium Plan subscription on their desktop computer in California from Defendant since December 1, 2010."[1]  *Id.* ¶ 25.

**B.     Ms. Bleak's Agreement to Arbitrate and Spotify's Disclosures.**

On August 26, 2013, Ms. Bleak contracted for streaming music service with Spotify, when she registered for the free service; nineteen minutes later, she upgraded to Spotify Premium. Declaration of James Whitehead ("Whitehead Decl.") ¶ 6.[2]  Spotify users such as Ms. Bleak must register to use any Spotify service, including the free service.  Declaration of Patrick Lambert ("Lambert Decl.") ¶ 6.  To register, subscribers may go to www.spotify.com using a web browser on a computer, tablet, or mobile phone or may download the Spotify application on an Apple, Android, or Windows mobile phone or tablet.  *Id.*  Here, Ms. Bleak used her personal computer to subscribe to Spotify.  AC ¶ 5; Whitehead Decl. ¶ 6.

A visitor to the Spotify website may become a registered user in any one of several ways. Lambert Decl. ¶ 6.  On August 26, 2013, one way to sign up was to select the "Get Spotify" button at the top of the website, which allowed a new user to register for the free Spotify service through Facebook or by using an email address.  *Id.* ¶ 6, Ex. A.  Registered users of the free service could then upgrade to Spotify's Premium service.  *Id.* ¶ 6.  Alternatively, a visitor to Spotify's website could click directly on the "Premium" button at the top of the webpage or the "Try Premium" button on the bottom of the page, which would take the user through the sign-up flow for the free service, followed by an opportunity to upgrade to the Premium service.  *Id.* ¶ 6, Exs. A, B.

After a user selects "Get Spotify," "Premium," or "Try Premium," the Spotify website asks the user to log in to an existing Spotify account or to create a new Spotify account.  *Id.* ¶¶ 6, 7, Ex. C.  Existing Spotify users (who have already agreed to Spotify's Terms & Conditions) may log in at this screen, but new users must select "Sign up" at the bottom of the log-in box to create a new account.  *Id.* ¶ 7, Ex. C.  After a new user—like Ms. Bleak—selects "Sign up," a box appears that

---

[1] The Spotify service launched in the United States in July 2011.  Whitehead Decl. ¶ 4 n.1.

[2] The Court may consider evidence outside the complaint on a motion to compel arbitration.  *See Alvarez v. T-Mobile USA, Inc.*, 2011 WL 6702424, at *3 (E.D. Cal. Dec. 21, 2011).

allows the user to register through Facebook or with an email address. *Id.* ¶ 7, Ex. D. The sign-up box states: "By clicking on Sign up, you agree to **Spotify's terms and conditions** and **privacy policy**." *Id.* The phrases "Spotify's terms and conditions" and "privacy policy" are both hyperlinks and clicking on the links leads a subscriber to Spotify's Terms & Conditions and Privacy Policy, respectively. *Id.* ¶ 7. Ms. Bleak selected "Sign up with your email address" and was taken to a page that required her to select a username and specify her email address, date of birth, and gender. *Id.* ¶ 7, Ex. E. Once again, this page notified Ms. Bleak that "By clicking on Sign up, you agree to **Spotify's terms and conditions** and **privacy policy**." *Id.* And again, the phrases "Spotify's terms and conditions" and "privacy policy" are hyperlinks that lead a user to Spotify's Terms and Conditions of Use and Privacy Policy, respectively. *Id.* ¶ 7. In other words, Ms. Bleak clicked the two Sign-up buttons and twice accepted the Terms & Conditions; she could not have signed up for the Spotify service—or purchased Spotify Premium—without doing so.

After creating her account, Ms. Bleak reached a screen allowing her to select a method of payment for Spotify Premium. Whitehead Decl. ¶ 7. Under "Choose your payment plan," the screen states that the subscriber will receive the first 30 days of Spotify Premium free and that "[w]ith an on-going monthly subscription you'll be charged each month after your trial ends. You can cancel your trial any time before it ends and no charges will apply. Learn more." *Id.* ¶ 7, Ex. 1. Under "Review your purchase," it states subscribers will be charged "$9.99 + tax / month after trial period." *Id.* The phrase "Learn more"—written in green on the payment screen—is a hyperlink and clicking on the link takes the subscriber to Spotify's 30-Day Free Trial Terms and Conditions. *Id.* ¶ 7, Ex. 2. The 30-Day Free Trial Terms and Conditions provide, in relevant part, that "By submitting your payment details, you accept the New 30-Days Free Trial Offer and . . . acknowledge and agree to Spotify Terms and Conditions of Use and these Spotify Premium Service General Free Trial Terms and Conditions." *Id.* (By the time she reached this point in the subscription process, Ms. Bleak had already accepted the Terms & Conditions twice.) After clicking "Continue" at the bottom of the payment screen, Ms. Bleak was taken to a screen requiring her to enter her payment information. *Id.* ¶ 7, Ex. 3. Above the "Confirm Payment" button, the confirm payment screen states:

4

SPOTIFY USA INC.'S MOTION TO COMPEL ARBITRATION AND STAY
*Bleak v. Spotify USA Inc.*, Case No. CV 13-05653 CRB
DWT 23347003v13 0098755-000003

> If you do not cancel your subscription before the end of the free trial the credit card you provide will automatically be charged the Spotify Premium subscription fee of US $9.99 + $0.00 sales tax per month, until you cancel. You can cancel at any time by logging into your Spotify account and follow[ing] the cancellation instructions. No refunds or credits for partial monthly subscriptions period. For complete terms and conditions, please see our Terms of Service.

*Id.*; AC ¶ 17. At this point in the transaction, Ms. Bleak entered her credit card information and clicked "Confirm Payment." Whitehead Decl. ¶¶ 7-8. The website then displayed a receipt on the screen and Spotify sent Ms. Bleak an email receipt at the email address she provided during the registration process. *Id.* ¶ 8, Exs. 4, 5. The email receipt reminded Ms. Bleak that "[a]t the end of the free trial the payment card [she] provide[d] will automatically be charged the Spotify Premium subscription fee of $9.99 (plus applicable taxes) per month." *Id.* ¶ 8, Ex. 5. It also provided a link to Spotify's 30-Day Free Trial Terms and Conditions. *Id.*; *see also id.* ¶ 7, Ex. 2. Spotify began charging Ms. Bleak for her Spotify Premium account on September 25, 2013. *Id.* ¶ 6. On December 27, 2013, after her monthly credit card payment could not be completed, Ms. Bleak logged into her Spotify account and entered new credit card information. *Id.* ¶¶ 6, 9. The "Legal" link, which leads to Spotify's Terms & Conditions, remained clearly visible in the bottom left corner of her screen while Ms. Bleak changed her payment method. *Id.* Exs. 6, 7.

Spotify's Terms & Conditions begin with a table of contents allowing subscribers to jump to any portion of the Terms & Conditions that interests them. Lambert Decl. ¶ 9, Ex. F at 1. Below this table of contents, Spotify welcomes subscribers to the Terms & Conditions and explains the document "is important and affects your legal rights, so please read [it] and our Privacy Policy carefully." *Id.* The "Introductions" section emphasizes that by subscribing to and using the Spotify service, customers enter into a binding contract with Spotify.

> Thanks for choosing Spotify (**"Spotify", "we", "us", "our"**). By using the Spotify service, websites, or software applications (together, the "Spotify Service" or "Service"), including by purchasing or receiving Codes or Limited Offers,[3] you are entering into a binding contract with our local company in your country of residence (your "Local Country") if applicable or the company listed in this chart. Your agreement with us includes these Terms and Conditions of Use (**"Terms"**) and our Privacy Policy (together with the Mobile Terms where applicable, the **"Agreements"**). If you don't agree with these Terms, then please don't use the Service.

---

[3] Hyperlinks on the website are marked in blue, as they appear in the Terms & Conditions.

*Id.* The table of contents includes a link to Spotify's arbitration provision identified as "19. Choice of law, mandatory arbitration and venue." *Id.* Subscribers may also reach this provision by scrolling down through the Terms & Conditions. *Id.* ¶ 9, Ex. F at 5-6. Section 19(i) of the Spotify Terms & Conditions provides, in part:

> You and Spotify agree that any dispute, claim or controversy arising out of or relating in any way to the Spotify Service or your use thereof, including our Agreements, shall be determined by mandatory binding arbitration. You agree that the U.S. Federal Arbitration Act governs the interpretation and enforcement of this provision, and that you and Spotify are each waiving the right to a trial by jury and the right to participate in a class or multi-party action.

*Id.* ¶ 9, Ex. F at 5. Section 19(iii) of Spotify's Terms & Conditions also makes clear Ms. Bleak promised to arbitrate claims on an individual basis, waiving the right to proceed in a class action:

> YOU AND SPOTIFY AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A CLASS MEMBER OR IN ANY REPRESENTATIVE CAPACITY OR PROCEEDING. Further, no arbitrator shall consolidate any other person's claims with your claims, and may not otherwise preside over any form of a multi-party or class proceeding.

*Id.* ¶ 10, Ex. F at 5-6.

Spotify's Terms & Conditions provide for arbitration before the American Arbitration Association ("AAA"). *Id.* ¶ 9, Ex. F at 5. The provision also informs subscribers the AAA's rules, including its consumer-friendly Supplementary Procedures for Consumer-Related Disputes, will apply. *Id.* Under Section 19(iv) of the Terms & Conditions, a subscriber's "arbitration fees and [his or her] share of arbitrator compensation will be limited to those fees set forth in the AAA's Consumer Rules with the remainder paid by Spotify. Any arbitration costs or fees deemed 'excessive' will be paid by Spotify." *Id.* ¶ 9, Ex. F at 6. Section 19(ii) excepts only a narrow class of disputes from arbitration, i.e., "any claims seeking to enforce, protect, or determine the validity or ownership of any intellectual property rights," as well as "any claims related to allegations of theft, piracy or unauthorized use of the Spotify Service," which can proceed in court. *Id.* ¶ 9, Ex. F at 5. These exceptions apply equally to Spotify and its users.

Ms. Bleak accepted Spotify's Terms & Conditions twice when she signed up for the Spotify service. She was directed to the Terms & Conditions yet again when she upgraded to Spotify Premium. Spotify alerted Ms. Bleak to its Terms & Conditions at least four times on

6

SPOTIFY USA INC.'S MOTION TO COMPEL ARBITRATION AND STAY
*Bleak v. Spotify USA Inc.*, Case No. CV 13-05653 CRB
DWT 23347003v13 0098755-000003

August 26. *See id.* ¶ 7; Whitehead Decl. ¶¶ 7-8. In addition, Spotify's website displayed the Terms & Conditions from July 2011 to the present at the Legal link in the bottom left corner of the page. Lambert Decl. ¶ 8; *see also* AC ¶¶ 15, 18. Ms. Bleak remains a Spotify subscriber and played music using Spotify's service as recently as January 23, 2014. Whitehead Decl. ¶ 6.

## IV. ARGUMENT

### A. The Federal Arbitration Act Reflects a Strong Policy Favoring Arbitrating Disputes that Fall within an Arbitration Clause, as This Dispute Does.

The FAA instructs that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Congress passed the FAA to "reverse the longstanding judicial hostility to arbitration agreements[,] . . . to place arbitration agreements upon the same footing as other contracts," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991), and "to ensure the enforcement of arbitration agreements according to their terms." *Concepcion*, 131 S. Ct. at 1748. "The standard for demonstrating arbitrability is not high." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999). The FAA requires courts to compel arbitration if (1) a valid agreement to arbitrate exists and (2) the dispute falls within the scope of that agreement. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). When an arbitration provision satisfies both conditions, the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts ***shall*** direct the parties to proceed to arbitration." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (citing 9 U.S.C. §§ 3 & 4).

Spotify's arbitration provision meets both conditions, requiring Ms. Bleak to arbitrate.

### 1. Ms. Bleak Agreed to the Arbitration Provision.

California state-law principles of contract formation govern the determination "whether [Ms. Bleak and Spotify] agreed to arbitrate" claims between them. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). In California, parties are bound to the contracts they sign, whether they read them or not. *See Oestreicher v. Alienware Corp.*, 502 F. Supp. 2d 1061, 1070 (N.D. Cal. 2007) ("[Plaintiff] cites no legal authority in support of the assertion that companies are required to ensure that customers actually read contracts before agreeing to them."). "The law is clear that a party entering a contract has responsibility for learning its terms and that each and

every term need not be explained orally to a party." *Chavez v. Bank of Am.*, 2011 WL 4712204, at *6 (N.D. Cal. Oct. 7, 2011) (granting motion to compel arbitration, in part). The law assumes a party has read the contract she signed and will not permit a party to avoid obligations due to a lack of diligence in reading the agreement. *Luafau v. Affiliated Computer Servs., Inc.*, 2006 WL 1320472, at *3 (N.D. Cal. May 15, 2006) (compelling arbitration); *Chavez*, 2011 WL 4712204, at *6 ("reject[ing] any suggestion that Plaintiffs are not bound by the arbitration clause or the Terms of Use based purely on the fact that the Plaintiffs did not read the contract or its terms").

Here, Ms. Bleak assented to Spotify's Terms & Conditions, including the arbitration and class action waiver provisions, when she registered for the Spotify service. She accepted the Terms & Conditions twice by clicking the two "Sign up" buttons when she first registered. *See* Lambert Decl. ¶ 7, Exs. D, E. Spotify also alerted Ms. Bleak to its Terms & Conditions when she paid for Spotify Premium the first time and when she received her email receipt. *See* Whitehead Decl. ¶¶ 7-8. Ms. Bleak cannot now avoid the Terms & Conditions, to which she expressly agreed and about which she was notified on several occasions. *See Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011) (compelling arbitration where contract involved "modified clickwrap" process in which terms of service not visible on the page but accessible via hyperlink); *Hauenstein v. Softwrap Ltd.*, 2007 WL 2404624, at *2-3 (W.D. Wash. Aug. 17, 2007) (collecting cases holding "clicking" agreement to terms of a contract constitutes assent).

Ms. Bleak also agreed to the arbitration provision by accepting and using Spotify's streaming music service. California courts "adhere to the objective theory of contract law." *Mission Viejo Emergency Med. Assocs. v. Beta Healthcare Grp.*, 197 Cal. App. 4th 1146, 1154 (2011) (enforcing arbitration clause though plaintiffs complained they lacked knowledge of it). Under the objective theory, where a party manifests acceptance, the terms bind her even though she did not sign the contract. *See Roth v. Malson*, 67 Cal. App. 4th 552, 557 (1998). The law also binds parties to a contract when the party accepts the benefits of an agreement, such as receiving goods and services. "[A] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal. App. 4th 1372, 1387

DAVIS WRIGHT TREMAINE LLP

8

(1993) (citation omitted). "It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes acceptance of the terms, which accordingly become binding on the offeree." *Cairo, Inc. v. Crossmedia Servs., Inc.*, 2005 WL 756610, at *5 (N.D. Cal. Apr. 1, 2005) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004)).

For several months—and even after filing this suit—Ms. Bleak used Spotify Premium's streaming music service, knowing Spotify provided that service subject to standard Terms & Conditions, which it made available on its website. *See* Lambert Decl. ¶ 8, Ex. F ("By using the Spotify service, websites, or software applications . . . you are entering into a binding contract."). She cannot now evade the terms of her agreement. "No person can be permitted to adopt that part of an entire transaction which is beneficial to him/her, and then reject its burdens." *NORCAL Mut. Ins. Co. v. Newton*, 84 Cal. App. 4th 64, 84 (2000) (citation omitted); *see also Blau v. AT&T Mobility*, 2012 WL 10546, at *3-4 (N.D. Cal. Jan. 3, 2012) (plaintiffs agreed to arbitration where they accepted AT&T's services and continued to use them); *Cairo*, 2005 WL 756610, at *5 (where plaintiff has actual or imputed knowledge of the terms of use, his use of that service "effectively binds [plaintiff] to [the] Terms of Use and the forum selection clause therein"); *Discover Bank v. Ray*, 162 P.3d 1131, 1133 (Wash. Ct. App. 2007) (plaintiff accepted terms of credit card agreement where agreement provided that use of the card constituted acceptance).

### 2. Ms. Bleak's Claims Fall within the Arbitration Provision.

Because the FAA reflects a "liberal federal policy favoring arbitration agreements," the Supreme Court has concluded "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). The Ninth Circuit has explained that courts therefore should "construe arbitration clauses expansively." *Simula*, 175 F.3d at 720-21 (refusing to narrowly construe clause requiring arbitration of claims "arising in connection with" underlying agreement). The Ninth Circuit recognizes arbitration clauses encompassing "[a]ny dispute, controversy, or claim" reach "broad and far" in scope, *Chiron Corp.*, 207 F.3d at 1131-32, and parties "routinely use[]" such clauses "to secure the broadest possible arbitration coverage." *Britton v. Co-op Banking Grp.*, 4 F.3d 742,

DAVIS WRIGHT TREMAINE LLP

745 (9th Cir. 1993). These clauses require arbitrating all disputes that "touch matters" covered by the contract defining the parties' relationship. *Simula*, 175 F.3d at 721.

Here, Spotify's Terms & Conditions contain a broad "any claim or dispute" clause encompassing "any dispute, claim or controversy arising out of or relating in any way to the Spotify Service or your use thereof, including" the Terms & Conditions, Privacy Policy, and Mobile Terms. Lambert Decl. ¶ 9, Ex. F at 5. The "any dispute, claim or controversy" clause extends to Ms. Bleak's claims, which arise from her purchase of Spotify's service. AC ¶ 5.

Because Ms. Bleak's claims arise out of and relate directly to her purchase of "the Spotify Service," her claims fall squarely within the broad arbitration clause. *See, e.g.*, *Johannsen v. Morgan Stanley Credit Corp.*, 2012 WL 90408, at *3-4 (E.D. Cal. Jan. 11, 2012) (agreement to arbitrate "all controversies" between parties "covers *any* claims rooted in the relationship created by the contract containing the arbitration clause"). Spotify's "any dispute, claim or controversy" provision "is precisely the kind of broad arbitration clause that justifies a presumption of arbitrability." *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998) (enforcing clause requiring arbitrating "[a]ny dispute, controversy or claim arising under or in connection with" agreement). Courts recognize "[a] clause governing claims 'related to' or 'concerning' the parties' agreement applies to a broader range of claims than a clause governing claims 'arising under' the agreement." *Schering Corp. v. First Databank, Inc.*, 479 F. Supp. 2d 468, 470-71 (D.N.J. 2007) (relying on arbitration cases to interpret scope of forum-selection clause) (quoting *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997)).

**B.     Ms. Bleak Cannot Invoke California Law to Avoid Her Obligation to Arbitrate Under the FAA.**

Section 2 of the FAA provides arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 2 reflects a "liberal federal policy favoring arbitration" and the "fundamental principle that arbitration is a matter of contract." *Concepcion*, 131 S. Ct. at 1745 (quotation marks and citations omitted). "[C]ourts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Id.* (citations omitted).

Under Section 2 of the FAA, a court may declare an arbitration provision unenforceable based on "'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* at 1746 (citation omitted). Thus, states may not impose rules contradicting the FAA's purpose of "ensur[ing] the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Id.* at 1748. Courts apply "state-law principles that govern the formation of contracts" to determine whether a valid and enforceable arbitration agreement exists. *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002). Spotify's Terms & Conditions select California law to govern the contract. Lambert Decl. ¶ 11, Ex. F at 5. As a result, this brief addresses arbitration under California law.

### 1. Under *Concepcion*, the FAA Requires the Court to Enforce Ms. Bleak's Agreement to Arbitrate on an Individual Basis.

Ms. Bleak agreed to arbitrate on an individual basis and she waived her right to participate in a class action. Federal law requires the Court to enforce Ms. Bleak's agreement as written.

The Supreme Court's 2011 decision in *Concepcion* compels this result. In *Concepcion*, the Supreme Court addressed lower court decisions "relying on the California Supreme Court's decision in *Discover Bank v. Superior Court*, 36 Cal. 4th 148, 113 P.3d 1100 (2005)," which found an "arbitration provision was unconscionable because AT&T had not shown that bilateral arbitration adequately substituted for the deterrent effects of class actions." *Concepcion*, 131 S. Ct. at 1745. (In *Discover Bank*, the California Supreme Court held a class action waiver in an arbitration agreement "in a consumer contract of adhesion" violated California law because "the waiver becomes in practice the exemption of the party 'from responsibility for [its] own fraud, or willful injury to the person or property of another.'" *Discover Bank*, 36 Cal. 4th at 162-63.) In reversing, the Supreme Court reaffirmed the "overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 131 S. Ct. at 1748. Although the FAA "preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* Requiring the availability of

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

classwide proceedings (1) ignores the terms of the parties' arbitration agreements and (2) interferes with the "streamlined proceedings" the FAA envisions. *Id.* at 1748-51.

Regarding the first point, the Court stated: "Arbitration is a matter of contract and the FAA requires courts to honor parties' expectations." *Id.* at 1752-53. Thus, after *Concepcion*, state law may not require class arbitration (or litigation) to promote prosecution of "small-dollar claims that might otherwise slip through the legal system." *Id.* at 1753. Indeed, states cannot require **any** procedure inconsistent with the parties' arbitration agreement as written, "even if [the procedure] is desirable for unrelated reasons." *Id.* On the second point, the Court reasoned requiring class arbitration would interfere with the FAA's goal of "streamlined proceedings" because it makes the process "slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* at 1749-51. This, in turn, led the Court to conclude conditioning enforcement of arbitration agreements on the availability of class action arbitration contradicted the "fundamental attributes of arbitration." *Id.* at 1748.

Because the *Discover Bank* rule conflicted with the FAA's goals and the "fundamental attributes of arbitration," the Court concluded it "create[d] a scheme inconsistent with the FAA." *Id.* at 1748; *see also id.* at 1750-51 (explaining *Discover Bank*, "to the extent it is manufactured by [state law] rather than consensual [agreement], is inconsistent with the FAA"); *see also Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."). As a result, the Court held the FAA preempts the *Discover Bank* rule (and would preempt any similar state law or rule). *Concepcion*, 131 S. Ct. at 1748.

Here, Ms. Bleak agreed to arbitrate all disputes with Spotify on an individual basis and waived her right to participate in a class action:

> YOU AND SPOTIFY AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A CLASS MEMBER OR IN ANY REPRESENTATIVE CAPACITY OR PROCEEDING. Further, no arbitrator shall consolidate any other person's claims with your claims, and may not otherwise preside over any form of a multi-party or class proceeding.

Lambert Decl. ¶ 10, Ex. F at 5-6. Under *Concepcion*, the FAA requires the Court to enforce the terms of Ms. Bleak's arbitration agreement, including the class action waiver.

Following *Concepcion*'s clear mandate, courts in this district routinely have rejected state-law challenges to arbitration clauses containing class action waivers. *See, e.g.*, *Blau*, 2012 WL 10546, at *5, *7 (compelling arbitration and explaining *Concepcion* "foreclose[d]" plaintiffs' public policy arguments); *Fimby-Christensen v. 24 Hour Fitness USA, Inc.*, 2013 WL 6158040, at *3-4 (N.D. Cal. Nov. 22, 2013) (compelling arbitration and rejecting plaintiff's unconscionability challenge to arbitration clause due to class action waiver); *Simpson v. Pulte Home Corp.*, 2012 WL 1604840, at *5 (N.D. Cal. May 7, 2012) (same); *Jasso v. Money Mart Exp., Inc.*, 879 F. Supp. 2d 1038, 1049, 1052 (N.D. Cal. 2012) (same); *Sanders v. Swift Transp. Co. of Az., LLC*, 843 F. Supp. 2d 1033, 1037 (N.D. Cal. 2012) (same); *Lewis v. UBS Fin. Servs. Inc.*, 818 F. Supp. 2d 1161, 1168 (N.D. Cal. 2011) (compelling arbitration despite class action waiver).

This Court should therefore compel Ms. Bleak to arbitrate her claims on an individual basis, as she agreed she would.

### 2. Spotify's Arbitration Provision Offers a Fair and Efficient Means of Resolving Disputes and Is Not Overly Harsh or One Sided.

Spotify's Terms & Conditions set forth a fair, unexceptional, and conscionable process for resolving Ms. Bleak's dispute. The Court should enforce them as written, because Ms. Bleak cannot show unconscionability of the arbitration clause under California law.

California sets forth a conjunctive test for unconscionability: a plaintiff must prove ***both*** procedural ***and*** substantive unconscionability to invalidate a contract provision. *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000). The procedural inquiry centers on surprise or oppression due to unequal bargaining power; the substantive inquiry focuses on "overly harsh or one-sided results." *Id.* California uses a "sliding scale" so "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." *Cisneros v. Am. Gen. Fin. Servs., Inc.*, 2012 WL 3025913, at *4 (N.D. Cal. July 24, 2012).

Spotify made its Terms & Conditions easily accessible to Ms. Bleak, and it notified her of the Terms & Conditions and the binding nature of those Terms on several occasions during her

13

registration process.  *See* Lambert Decl. ¶¶ 7-8; Whitehead Decl. ¶¶ 7-8.  The Terms & Conditions are written in clear language and a large, easy-to-read font.  *See* Lambert Decl. Ex. F.  Ms. Bleak had ample opportunity to review the Terms & Conditions; she chose to subscribe to Spotify's Premium service and to become bound by this agreement.  She even submitted new payment information in December 2013 to continue her subscription, choosing to remain bound by the agreement.  Whitehead Decl. ¶ 9.  She cannot plausibly argue surprise or oppression.

Although Ms. Bleak agreed to a standardized, online contract, "the times in which consumer contracts were anything other than adhesive are long past."  *Concepcion*, 131 S. Ct. at 1750.  The economy would grind to a halt if businesses such as Spotify had to negotiate contracts individually to avoid the label of procedural unconscionability.  Adhesion contracts "are a fact of modern life.  Consumers routinely sign such agreements to obtain credit cards, rental cars, land and cellular telephone service . . . .  It cannot reasonably be said that all such contracts are so procedurally unconscionable as to be unenforceable."  *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 266 (Ill. 2006).  As this Court has explained in a similar context (i.e. a cellular telephone contract), the lack of surprise and significant number of consumer choices for streaming music services make the Terms & Conditions, at most, "minimally procedurally unconscionable." *See Hendricks v. AT&T Mobility, LLC*, 823 F. Supp. 2d 1015, 1023 (N.D. Cal. 2011).

Under California's conjunctive unconscionability test, Ms. Bleak must show significant substantive unconscionability to avoid her obligation to arbitrate.  She cannot make that showing.  "Substantive unconscionability relates to the effect of the contract or provision."  *West v. Henderson*, 227 Cal. App. 3d 1578, 1588 (1991), *overruled on other grounds*, *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit. Assoc.*, 55 Cal. 4th 1169 (2013).  Courts focus on whether a contract unfairly favors one party over the other when examining substantive unconscionability.  *See Armendariz*, 24 Cal. 4th at 114.  "The focus of the inquiry is whether the term is one-sided and will have an overly harsh effect on the disadvantaged party."  *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 997 (9th Cir. 2010) (citing *Harper v. Ultimo*, 113 Cal. App 4th 1402, 1407 (2003)).

Here, Spotify's arbitration clause imposes a bilateral obligation to arbitrate, subject only to a bilateral exception from arbitration for cases involving theft or intellectual property disputes. The agreement thus provides far more than the "modicum of bilaterality" necessary to avoid unconscionability. *Pokorny*, 601 F.3d at 998 (quoting *Armendariz*, 24 Cal. 4th at 117). Bilateral exceptions to arbitration, applicable to consumers and the corporation, remain conscionable and enforceable. *See In re DirecTV Early Cancellation Fee Litig.*, 810 F. Supp. 2d 1060, 1069 (C.D. Cal. 2011), *overturned on other grounds by Lombardi v. DirecTV, Inc.*, 2013 WL 6224642 (9th Cir. Dec. 2, 2013) (enforcing arbitration provision containing mutual exceptions to arbitration). Further, leaving aside the bilateral nature of the exceptions to arbitration, the exceptions "cannot be categorized as 'overly harsh.'" *Id.* (quoting *Pokorny*, 601 F.3d at 997).

Spotify's arbitration provision gives subscribers such as Ms. Bleak a convenient and efficient means to resolve their disputes. The AAA conducts arbitrations pursuant to rules developed to make the process easy for consumers, i.e., the Supplemental Procedures for Consumer-Related Disputes. Lambert Decl. ¶ 9, Ex. F at 5. The class action waiver promotes efficient and economic resolution by reducing the number of parties, procedural obstacles, and costs of pursuing claims. *Concepcion*, 131 S. Ct. at 1751 (class arbitration "makes the process slower, more costly, and more likely to generate procedural morass than final judgment"). The Court should enforce the Terms & Conditions.

## V. CONCLUSION

Spotify respectfully requests that the Court (a) compel Ms. Bleak to arbitrate her claims on an individual basis and (b) stay this case pending the outcome of those proceedings.

Respectfully submitted this 27th day of January, 2014.

DAVIS WRIGHT TREMAINE LLP
Attorneys for Defendant Spotify USA Inc.

By: */s/ Joseph E. Addiego III*
Stephen M. Rummage
Joseph E. Addiego III
Candice M. Tewell

DAVIS WRIGHT TREMAINE LLP